*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*

September 11, 2019

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Richard Ochetal*,
               S1 16 Cr. 342 (SHS)

Dear Judge Stein:

      The Government respectfully submits this letter to advise the Court of pertinent facts concerning the assistance that Richard Ochetal has rendered in the investigation and prosecution of other targets of criminal activity involving extensive corruption in New York Police Department's Pistol License Division (the "License Division"). In light of these facts, and assuming that Ochetal continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines, that the Court sentence Ochetal in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines. Ochetal is scheduled to be sentenced on September 25, 2019 at 2:30 p.m.

## The Underlying Criminal Conduct

      On or about June 14, 2016, Ochetal waived indictment, self-surrendered, and pleaded guilty pursuant to a cooperation agreement to superseding information S1 16 Cr. 342 (SHS), charging him with bribery offenses. Specifically, the S1 Information charged Ochetal with one count of federal program bribery, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2 (Count One), and one count of conspiracy to commit federal program bribery, in violation of 18 U.S.C. § 371 (Count Two). Ochetal's offenses related to his acceptance of bribes while serving as a New York City Police Department ("NYPD") officer in the License Division from Alex "Shaya" Lichtenstein and Frank Soohoo, two gun license "expediters," and Gaetano Valastro, a gun store owner.

      Beginning in approximately 2013 and continuing until approximately 2016, Ochetal accepted bribes from Lichtenstein, Soohoo, and Valastro on a number of occasions in exchange for granting clients of theirs favorable treatment in gun license matters. Ochetal often acted in concert, and at the direction of, co-conspirator David Villanueva, a supervisor in the License Division, as well as License Division Lieutenant Paul Dean and Commanding Officer Michael Endall. The favorable treatment Ochetal provided to clients of Lichtenstein and Soohoo typically consisted of the granting gun licenses quickly and without proper review, often gun licenses that allowed the clients the right to carry firearms concealed on their person anywhere in New York

City at any time. For Valastro, Ochetal occasionally assisted in expediting gun licenses at his request but primarily assisted him by delivering gun purchase authorization forms for licensees directly to Valastro's store, which was against NYPD protocol. This assisted Valastro by increasing the likelihood that gun license recipients would purchase their firearms from Valastro's gun store, rather than another dealer.

Ochetal admitted to pushing through and approving, at times with little or none of the required due diligence conducted by him, approximately 100 gun permit applications submitted by Lichtenstein and approximately 50 applications submitted by Soohoo. In return, Ochetal received cash and gifts from Lichtenstein (through David Villanueva), Soohoo, and Valastro.

At the time Ochetal began cooperating with the investigation, Ochetal had served in the NYPD for approximately 14 years and held the rank of Police Officer. Ochetal had served as a transit officer until, as a result of an injury, he was placed on restricted duty and transferred to the License Division in or around 2009, where he served the NYPD for several more years before his involvement in any criminal conduct. Shortly after Lichtenstein's arrest in April 2016, Ochetal was modified – that is, removed from his standard duties – and began cooperating with the investigation.

### A. The Alex "Shaya" Lichtenstein Bribery Scheme

Alex "Shaya" Lichtenstein bribed Ochetal, along with his co-conspirator Villanueva, in exchange for assistance with License Division matters. Lichtenstein served for many years as a high-ranking supervisor in the Borough Park-based Shomrim, a volunteer neighborhood patrol, and through his connections to law enforcement, Lichtenstein created a business expediting gun license applications. As a so-called expediter, Lichtenstein charged significant sums of money to assist individuals with filling out applications to the License Division and to advise them throughout the process of seeking a gun license. In connection with his expediting business, Lichtenstein engaged in a scheme to kick back some of his fees to New York City Police Department officers, including Ochetal, in order to ensure that the officials approved, or at the very least expedited, his clients' applications.

Ochetal first met Lichtenstein in or about 2013 through Villanueva, and soon learned that Lichtenstein was bringing clients to get permits at the Licensing Division. Ochetal also learned that Lichtenstein was working with Villanueva, who was Ochetal's superior officer. Initially, Ochetal approved Lichtenstein's clients because Villanueva was his superior officer and he considered Villanueva a close friend. As a general matter, gun license applications were first vetted for approval or disapproval by officers like Ochetal, and then reviewed by supervisors like Villanueva.

By approximately late 2014, Ochetal began sharing in the payments and gifts Lichtenstein showered on Villanueva. Villanueva received substantially more in bribes than Ochetal, but Ochetal did receive approximately $1,000 in cash, which was passed through Villanueva to Ochetal, bottles of liquor, and at least one limousine ride for Ochetal and Villanueva to a vineyard.

Ochetal participated in granting approximately 100 licenses for clients of Lichtenstein, on a highly expedited basis and without proper justification. He did so in part because of the money and gifts he and Villanueva received. Ochetal's role was to provide special attention to Lichtenstein's clients, fingerprint them, collect basic data, and quickly provide initial approval for the license without completing all the necessary protocols. Often, soon after a Lichtenstein client

came to the Licensing Division, Villanueva would tell Ochetal to "close out" the file, meaning enter Ochetal's approval. Ochetal would then pass the files on to the next level, often through David Villanueva, and Villanueva would enter his own approval and issue the permit. Final approval was performed by the License Division's then-executive officer Michael Endall, who in practice deferred to Villanueva's approval of Lichtenstein clients.

In many instances, Villanueva and Ochetal did not conduct any substantive interview of Lichtenstein's clients, despite License Division protocol requiring interviews. They performed only minimal diligence, often doing no more than running an individual's rap sheet and mental hygiene history. Moreover, because of Lichtenstein's bribes, Villanueva and Ochetal conducted little to no investigation into whether applicants for "business carry" licenses had a legitimate business need for those licenses. Such licenses, sometimes called "Full Carry" licenses, could permit the holder to carry gun at any time and any place in New York City. Ochetal and Villanueva often upgraded Lichtenstein's clients to "Full Carry" without obtaining any further documentation or following normal procedures. After the licenses had been approved, Villanueva and Ochetal would also gather supporting documentation to add to the files in order to disguise the fact that the licenses had been approved without proper documentation. As a result of this conduct, individuals received gun licenses even though they had misdemeanor convictions and, in at least one instance, a felony conviction; a history of domestic violence; and substantial driving violations. Individuals with significant arrest histories were also approved.

### B. The Frank Soohoo Bribery Scheme

Frank Soohoo was the proprietor of a police equipment store who was friends with Ochetal, Villanueva, and other NYPD officers. After their friendship began, at Villanueva's suggestion, Soohoo began a gun license expediting business out of his store. From approximately 2014 to 2016, Soohoo approached Ochetal and other NYPD officers about gun license matters for clients of Soohoo, and provided Ochetal and other officers with expensive gifts, largely in the form of vacations, in exchange for license approvals for Soohoo's clients.

Soohoo paid in cash for several expensive vacations with Ochetal, Villanueva, and their wives (which Soohoo and his own wife would also attend). Soohoo paid for approximately three vacations benefiting Ochetal, to the Bahamas, Mexico, and the Dominican Republic. In addition to the vacations, Soohoo routinely provided expensive sushi lunches for Ochetal, Villanueva, Dean, and Espinel, either through catering at Soohoo's police equipment store or dining out, and hosted Ochetal, Villanueva, Dean, and Espinel at the store for after-hours parties on approximately three occasions. In addition to paying for the food and alcohol at these parties, Soohoo paid for prostitutes to attend two of the parties. Ochetal did not personally patronize the prostitutes. On at least one occasion, Soohoo also gave Ochetal a couple of hundred dollars in cash for Ochetal's assistance at the License Division.

Ochetal assisted approximately 50 of Soohoo's clients in license-related matters, including approving licenses for unqualified applicants. Ochetal helped expedite these approvals for Soohoo, much in the same way as he had done for Lichtenstein.

### C. The Gaetano Valastro Bribery Scheme

Gaetano Valastro was a retired police officer who ran a firearms store and training facility. Beginning late in 2014 and continuing throughout 2015, Valastro gave Ochetal several free or heavily discounted firearms, firearms accessories (such as ammunition, magazines, and holsters),

and bottles of liquor. On at least one occasion, Valastro gave Ochetal approximately $500 in cash. In exchange, Ochetal assisted several gun license applicants associated with Valastro by expediting and/or truncating the proper review of their applications. In addition, Ochetal delivered gun purchase authorization forms –generated by the License Division following the issuance of a license – directly to Valastro's store, to help ensure that the licensee would purchase a firearm from Valastro rather than another dealer. This was against NYPD protocol, which required licensees to pick up the forms directly from One Police Plaza.

Further, in late 2015, two other NYPD officers in the License Division, Lieutenant Paul Dean and Robert Espinel, approached Ochetal and Villanueva with a new bribery scheme involving Valastro. At the time, Lieutenant Dean was executive officer, the second-in-command uniformed officer, at the License Division. Dean and Espinel planned to retire from the NYPD and create their own gun license expediting business based out of Valastro's store. In order to ensure the success of their business, Espinel, Dean, and Valastro planned to bribe Ochetal and Villanueva to enable their clients to get special treatment from the NYPD. Espinel and Dean held a meeting with Ochetal and Villanueva at which they pitched this plan in detail, expressing that it would be preferable for Ochetal and Villanueva to take bribes from Espinel and Dean, whom they could trust, rather than from other gun-license expediters. At this meeting, Ochetal and Villanueva both signaled their assent to the plan, though they each harbored doubts about pursuing it.

Around this time, however, increased scrutiny was cast upon the License Division when rumors arose that Lichtenstein was charging as much as $16,000 for a gun license. Perceiving heightened risks, Ochetal and Villanueva did not follow through on the proposed scheme involving Dean, Espinel, and Valastro. Lichtenstein was arrested within a few months, and Ochetal began cooperating with the investigation.

### D. Involvement in the Jeremy Reichberg Gun License

In or around 2014, Ochetal also assisted in expediting a gun license application for Jeremy Reichberg, a self-styled "community liaison" from Brooklyn who was separately bribing NYPD Deputy Inspector James Grant and other police officers. Based on approvals from Ochetal, Villanueva, and Captain Endall, Reichberg was given a Full Carry gun license despite lacking proper paperwork and any legitimate justification for such a license. Ochetal helped issue this gun license within less than two months, despite lacking the required paperwork, because he understood Reichberg's license was a favor for Grant. Endall directed Ochetal to hurry up and approve Reichberg because he was "Jimmy Grant's guy."[1] Although Ochetal acted improperly in approving the license, he was unaware that Reichberg was bribing Grant.

---

[1] Grant made efforts in 2015 to arrange the same treatment for Jona Rechnitz, a co-conspirator who was working with Reichberg to bribe Grant; however, Rechnitz never completed his pursuit of the gun license and it was ultimately not issued.

## **Ochetal's Cooperation**

Ochetal's early cooperation served as a catalyst for a number of the Government's investigations and prosecutions related to widespread and disparate corrupt schemes involving the License Division. Prior to ever being personally charged, Ochetal was approached by law enforcement officers and voluntarily began proffering with the Government. He pleaded guilty without being indicted or ever requesting or seeing discovery; became the first cooperating witness in this large-scale police corruption investigation; and provided substantial assistance that led to multiple successful prosecutions. His cooperation was a critical component in pursuing charges against Villanueva, Soohoo, Dean, Espinel, and Valastro, and also contributed significantly to the prosecution of Grant and Reichberg. Ochetal's readiness to provide testimony assisted the government in securing guilty pleas from Lichtenstein, Villanueva, Soohoo, Dean, Espinel, and Valastro, and the strength of Ochetal's cooperation even assisted the Government in procuring the cooperation of certain of these defendants themselves, including Villanueva. Ochetal provided important and detailed testimony at trial against two defendants – Grant and Reichberg. It also bears noting that Ochetal's relative culpability is less than that of Villanueva, a superior officer in the License Division who also cooperated and who the Court previously sentenced to four months in prison. For these reasons, and as further detailed below, we respectfully submit that Ochetal's sentence should reflect the substantial assistance that he provided to the Government.

### **I.  Ochetal's Initial Cooperation and Assistance in the Charged Case**

Ochetal first proffered on May 13, 2016, less than one month after Lichtenstein's arrest. At the time, there were no charges pending against Ochetal, or any other officers in the License Division. Ochetal was approached by agents around the time of Lichenstein's arrest, and provided some information but substantially minimized his culpability and knowledge of misconduct by others. He promptly retained counsel, and rather than be indicted and challenge his case, he immediately began voluntarily cooperating and admitted the full extent of his misconduct. No other member of the License Division elected to cooperate so early.

Over the course of three original extensive proffers, Ochetal provided details of his corrupt conduct with Lichtenstein, Soohoo, and Valastro, and his close friend, David Villanueva, as well as his knowledge of the corrupt conduct of Dean and Espinel. At the time, Ochetal's illicit dealings with Soohoo and Valastro were unknown to the Government. It was Ochetal's admissions that first revealed those schemes. Following his plea, Ochetal met with the Government many more times, reviewing these schemes in detail, examining particular license files, and later, preparing for trial.

Ochetal demonstrated great courage as the first officer to come forward and expose the extent of the corruption in the License Division. As the most junior officer implicated in the scheme, he did so while accepting significant consequences for himself. Ochetal accepted his own criminal liability, lost his job, forwent future potential retirement and other benefits from the NYPD, and reported the criminal conduct of multiple co-conspirators, most of whom had been his friends. Ochetal broke ranks, reporting the conduct even of his NYPD supervisors, including Villanueva and Dean.

Ochetal's information was crucial to enabling the Government to charge Villanueva, who in turn became a significant cooperating witness in his own right, as well as Dean, Espinel, Valastro, and Soohoo. Had any of these individuals gone to trial—as it seemed likely when Ochetal began proffering with the Government—Ochetal would have been a critical witness. Ultimately, Lichtenstein was sentenced by the Court to 32 months' imprisonment in March 2017. Villanueva was sentenced, pursuant to the Government's 5K1.1 motion in his case, to four months' imprisonment. Soohoo is awaiting sentencing.

## II. *United States* **v.** *Paul Dean, Robert Espinel, and Gaetano Valastro*, **17 Cr. 398 (ER)**

The case against Paul Dean, Robert Espinel, and Gaetano Valastro was a direct result of Ochetal's cooperation, as well as the cooperation of Villanueva. Without the cooperation of both of these witnesses, the criminal conduct of these men may never have been uncovered and charged. As discussed above, Paul Dean had been the second-in-command at the License Division, holding the rank of Lieutenant, and Robert Espinel was another fellow License Division officer. To date, Dean is the highest-ranking officer charged in connection with the federal investigation of misconduct at the License Division. In significant part due to Ochetal's cooperation, Dean and Espinel were charged with accepting bribes and gratuities in exchange for favors during their time in the License Division, their post-retirement conspiracy with Valastro to become expediters themselves by bribing Villanueva and Ochetal, and extorting other expediters, including Lichtenstein, to cede business to them. These charges relied substantially on information provided by Ochetal. Indeed, Ochetal was the first person to expose this scheme to the Government. Ochetal's information jumpstarted the investigation into these individuals. Had the case proceeded to trial, Ochetal's testimony would have been essential to the prosecution.

Ultimately, all three defendants pleaded guilty. The strength of the evidence supplied by Ochetal – whose cooperation was known to the defendants – and the potential impact of his testimony were critical factors in securing their timely acceptances of responsibility. Without Ochetal's cooperation, this scheme may never have been uncovered, and it is unlikely that these convictions could have been obtained.

The Honorable Edgardo Ramos sentenced Dean to 18 months' imprisonment in January 2019, and Espinel to a year and a day of imprisonment in April 2019. Valastro is awaiting sentencing.

## III. *United States* **v.** *James Grant, Michael Harrington, and Jeremy Reichberg*, **16 Cr. 468 (GHW)**

Ochetal served as a critical witness at the trial of James Grant and Jeremy Reichberg, conducted before Judge Gregory H. Woods in November 2018 through January 2019. He testified over the course of two days, and endured substantial cross-examination. Although Ochetal had not personally received bribes from Reichberg, he was an important witness to a key official action former NYPD Deputy Inspector James Grant had delivered for Reichberg's benefit: a full carry gun license. Ochetal was able to compellingly testify that he had issued a full carry gun license for Reichberg without conducting appropriate diligence because of Grant's influence. Specifically, Ochetal described how the license was issued at the behest of Villanueva and

Commanding Officer Michael Endall's directive to approve Reichberg because Reichberg was "Jimmy Grant's guy." His testimony dovetailed with other evidence in the case demonstrating Grant's actions to influence the issuance of a gun license to Reichberg on a highly expedited basis, through contacts with Villanueva, among other things. Ochetal made plain that he knew the license should not have been issued to Reichberg and that he approved it solely as a result of these directives.

The trial concluded with a split verdict: conviction on nearly all counts for Reichberg, and acquittal for Grant. Ochetal's testimony proved essential to securing Reichberg's conviction. Indeed, the only testimony requested by the jury in their deliberations was that of Ochetal, and of Villanueva, who also testified at the trial about Grant's exercise of influence over the approval of Reichberg's gun license. The conviction of Jeremy Reichberg was itself of great significance. Reichberg had engaged in a far-reaching scheme to bribe some of the highest-ranking members of the NYPD, along with other public officials, for at least eight years. In exchange for bribes, Reichberg demanded and often received a wide range of official actions, including the deployment of NYPD cars, boats, and helicopters to serve himself and his associates; influence over personnel transfers and promotions; favorable dispositions on arrests; police interference in ordinarily civil disputes; and more.

Reichberg was convicted after a two-month trial and ultimately sentenced by the Honorable Gregory H. Woods to 48 months' imprisonment.

While Grant was ultimately acquitted by the jury, the verdict did not appear to reflect any determination about Ochetal's credibility. Ochetal's testimony was simply one piece of evidence in a complex trial, which required the jury to weigh numerous factors in assessing each defendant's guilt. Ochetal fulfilled his responsibility to testify truthfully when called, irrespective of the outcome.

### Assessment of the Defendant's Cooperation

Ochetal met with the Government dozens of times over the course of two and a half years. In each meeting, Ochetal was remorseful, honest, forthcoming, and intensely serious. Ochetal did not seek to displace responsibility for his own misconduct. Though each meeting required Ochetal to revisit events associated with his own painful public disgrace, Ochetal persevered, patiently attended all meetings without complaint, and worked to supply all information available to him. To the undersigned, Ochetal's anguish over his own misdeeds was palpable and tragic.

Ochetal's cooperation proved highly effective. Ochetal contributed significantly to three prosecutions and the convictions of seven defendants, including the convictions of the former Executive Officer of the Licensing Division, a second police officer, and the conviction of David Villanueva, once Ochetal's supervisor, mentor, and close friend turned co-conspirator. He testified at trial over the course of three days, and proved a credible witness who withstood extensive cross-examination. Though Ochetal's criminal conduct contributed to the systemic corruption of an important and sensitive government function – the awarding of gun licenses – his cooperation greatly assisted the Government and the NYPD in combatting that same corruption, both in

prosecuting many others who participated it and in spurring what has become much-needed reform at the Licensing Division. His substantial assistance thus merits significant credit.

### Analysis of Section 5K1.1 Factors

1. "[S]ignificance and usefulness" of assistance (5K1.1(a)(1))

Ochetal's cooperation was extremely significant and useful. As discussed above, Ochetal enabled the Government to bring charges against Villanueva, Soohoo, Dean, Espinel, and Valastro at all, contributed substantially to the Government's ability to bring charges against Grant and Reichberg, and was critical to the Government's successful prosecution of Lichtenstein. While some of these individuals, including Villanueva, also cooperated, none had elected to do so at the early stage at which Ochetal did, and indeed Ochetal's information assisted in the original charges against Villanueva in the first place.

Ochetal's cooperation further informed other investigations, whether or not they resulted in charges or convictions, such as the investigation and prosecution of James Grant, a high-ranking official in the NYPD, and the related conviction of Jeremy Reichberg. Ochetal's willingness to testify helped secure the convictions of Lichtenstein, Villanueva, Soohoo, Dean, Espinel, and Valastro, in addition to Reichberg. The force of Ochetal's cooperation likely played a significant role in compelling several of Ochetal's former co-conspirators, including Villanueva, to plead guilty and cooperate themselves rather than face Ochetal's testimony at trial against them.

2. "[T]ruthfulness, completeness, and reliability" of information and testimony (5K1.1(a)(2))

The Government believes that Ochetal provided truthful, complete and reliable information, and that he did so from the beginning of his cooperation. Ochetal's information was later corroborated by numerous License Division records, text messages, emails, and the later interviews and proffers of Villanueva, Valastro, Soohoo, and others. Ochetal was also candid about the limits of his knowledge and memory. As Ochetal testified at the Reichberg-Grant trial on cross-examination, "substantial [assistance] is just, for me, is just recalling truthfully what I can remember about a situation, nothing more, nothing less. I'm not trying to take away or add anything. . . . I'm just trying my hardest to remember what I can and provide information when asked." (*United States v. Reichberg and Grant*, 16 Cr. 656 (GHW), Nov. 19, 2018 Tr. 2137-38.)

3. "[N]ature and extent" of assistance (5K1.1(a)(3))

Ochetal's cooperation was extensive and involved numerous lengthy debriefings, the review of voluminous License Division documentation, and substantial testimony at trial. Ochetal's information and willingness to testify at trial aided the Government in bringing charges against at least seven defendants across multiple cases. Ochetal's cooperation also assisted the NYPD to identify additional gun-license holders who had benefited from these unlawful schemes, and to take action where appropriate to revoke, suspend, or review their eligibility for those licenses. These actions were important to mitigating the potential public safety risks caused by the conduct of Ochetal and his co-conspirators.

  4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (5K1.1(a)(4))

  As Your Honor is aware, it is inherently risky for a criminal defendant to cooperate with the Government, particularly where his cooperation involved an extensive scheme and implicated defendants who were former senior law enforcement officers.  Although there were no specific threats to Ochetal or his family that the Government is aware of, the cases for which Ochetal provided critical cooperation and testimony were closely covered by local news media, magnifying the reputational impact of Ochetal's testimony significantly.  Ochetal's anguish in publicly recounting his own misconduct was acutely felt in preparation for his testimony, and openly displayed in the courtroom during the Reichberg-Grant trial.  Lastly, as part of Ochetal's cooperation and prompt guilty plea, he gave up his ability to contest his rights to numerous valuable NYPD benefits, such as retirement payments, which had not yet vested at the time of Ochetal's plea.

  5. "[T]imeliness" of assistance (5K1.1(a)(5))

  Ochetal was the first defendant in the scheme to cooperate and began proffering within weeks of his approach by law enforcement and the arrest of Lichtenstein.  At the time of Ochetal's cooperation, only one defendant – Lichtenstein – had been charged.  No police officers had been criminally charged.  Ochetal did not know whether or not he would ultimately be charged.  Nonetheless, Ochetal came forward, accepted responsibility for his own crimes, and began cooperating to reverse the tide and help root out the rampant corruption pervading the License Division at the time.  Virtually the entire constellation of cases to follow proceeded after Ochetal's cooperation ignited further investigations.  The timeliness of Ochetal's cooperation largely enabled the prosecutions of Villanueva, Soohoo, Dean, Espinel, and Valastro, and contributed substantially to the Government's prosecution of Grant and Reichberg.

## **Conclusion**

In light of the foregoing, the Government respectfully submits that Ochetal's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of a major public corruption scheme. *See* U.S. Sentencing Guidelines § 5K1.1(a)(1). The Government also believes that the information provided by Ochetal was "truthful[], complete[], and reliab[le]." *See id.* § 5K1.1(a)(2). Accordingly, assuming that Ochetal continues to comply with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Ochetal in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: s/ Kimberly J. Ravener
Kimberly J. Ravener
Assistant United States Attorney
(212) 637-2358

cc: John Arlia, Esq.